Filed 5/19/15  In re A.Y. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re A.Y., a Person Coming Under the Juvenile Court Law. | B257763 (Los Angeles County Super. Ct. No. DK05455) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. N.S., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Veronica McBeth, Judge.  Affirmed.

Jarrette & Walmsley, Robert R. Walmsley, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Jacklyn K. Louie, Principal Deputy County Counsel for Plaintiff and Respondent.

## INTRODUCTION

The juvenile court sustained a Welfare and Institutions Code section 300[1] petition alleging that two-year-old A.Y. came within the court's jurisdiction. On appeal, N.S. (father) contends that juvenile court's jurisdictional findings as to him are not supported by substantial evidence, the juvenile court erred under section 361, subdivision (c)(1) (now section 361, subdivision (c)(1)(B)) by failing to allow him custody of A.Y. as a non-offending parent, the juvenile court erred under section 361.2 by failing to make a finding that placement with him would be detrimental to A.Y., and the Los Angeles County Department of Children and Family Services (Department) failed to provide evidence that it considered reasonable alternatives to removing A.Y. from father's custody. Although A.Y.'s mother (mother)[2] does not challenge the juvenile court's jurisdictional findings as to her, and we thus need not address father's challenge to the juvenile court's jurisdictional findings as to him, we address father's challenge. We affirm the juvenile court's ruling that it had jurisdiction over A.Y., certain of its jurisdictional findings as to father, and its dispositional order.

## BACKGROUND

On June 11, 2014, the Department filed a section 300 petition that alleged, as ultimately amended and sustained, as follows:

"[b-1] The child [A.Y.]'s mother, [mother], has a history of methamphetamine use and marijuana, which renders the mother incapable of providing regular care for the child. On prior occasions in 2014, the mother was under the influence of illicit drugs while the child was in the mother's care and supervision. The child's father, [N.S.] knew of the mother's illicit drug use and failed to protect the child. Such illicit drug use by the mother and the father's failure to protect the child endangers the child's physical health

---

[1]    All statutory citations are to the Welfare and Institutions Code unless otherwise noted.

[2]    Mother's initial also are "A.Y."

and safety and places the child at risk of physical harm, damage, danger and failure to protect.

"[b-2]  The child, [A.Y.]'s father, [N.S.], has a history of methamphetamine and alcohol use and a 2012 conviction for driving under the influence of alcohol, which renders the father incapable of providing regular care for the child.  Such substance abuse by the father endangers the child's physical health and safety and places the child at risk of physical harm, damage and danger.

"[b-3]  The child, [A.Y.]'s mother, [mother] and father, [N.S.], have a history of engaging in mutual physical altercations in the child's presence.  Such violent conduct on the part of the mother and father endangers the child's physical health and safety and places the child at risk of physical harm, damage and danger."

The Department's June 11, 2014, Detention Report stated that the Department had received a referral concerning A.Y. after mother and maternal grandmother arrived at Pomona Valley Hospital appearing to be "under the influence of a substance."  A.Y., who was with mother and maternal grandmother, was covered in mud.  After nurses cleaned and fed A.Y., neither mother nor maternal grandmother interacted with him.  Mother did not ask about A.Y. after being separated from him.  Mother tested positive for amphetamines.  A.Y.'s drug screen was negative.  A.Y. was taken into protective custody due to mother's positive drug screen and because she was "heavily under the influence" and unable to care for him.

Maternal great grandmother, with whom mother and A.Y. lived, reported to a Pomona Police Department officer that mother had a history of methamphetamine use.  She further told the officer that mother and father had an unreported history of domestic violence.  Although she had not seen father strike mother, she had seen bruises on mother.  According to maternal great grandmother, mother had not reported father to the police because she was afraid of him.  Maternal great grandmother felt that father might abuse A.Y. because he had abused mother.  She encouraged mother to seek full custody of A.Y. after father threatened to kidnap A.Y. and never return him.  Father had court ordered "visitation" with A.Y. every other weekend from Friday evening to Sunday

evening and had regular contact with mother. When a social worker asked mother if others had witnessed father's reported domestic violence, mother responded, "No he does it when no one is around."

Maternal great grandmother said that mother did not graduate from high school and began socializing with father who sold drugs and whom, maternal grandmother believed, started mother on drugs. According to a Pomona Police Department officer, father was then on probation for a driving under the influence conviction. Father's probation was scheduled to end on March 28, 2015.

A social worker interviewed mother after she was discharged from the hospital. Mother denied that she took amphetamines and said that she did not know why she tested positive. She admitted recent marijuana use. She said that she had had domestic violence incidents with father, but that he had hit her only once, four years prior. The social worker asked mother if father had ever pushed or shoved her. Mother responded, "Yes, but not hard." Mother explained that in November 2013, father became upset when the family was getting ready for A.Y.'s doctor's appointment and pushed her, but that she "didn't fall or anything." The social worker then asked mother if father had ever choked her. Mother responded, "Not really, it wasn't like I passed out." Mother stated that she never reported the domestic violence incidents and admitted that there had been instances where she had pushed father.

Mother said that father had court-ordered visits with A.Y. every Wednesday and every other weekend. Mother had no safety concerns for A.Y. when he was with father. Father told the social worker that in September 2013 he began a proceeding in family law court and had filed for full custody of A.Y. He had a good relationship with mother and saw A.Y. whenever possible.

The social worker told father that mother tested positive for amphetamines and father said that he suspected mother was using methamphetamine again based on her behavior. According to father, mother "would have a confused look on her face as if she was lost," and "[s]he just hasn't been herself." Father said that while A.Y. was in

4

mother's care, he would go to mother's home a few times a day to check on and feed A.Y. He did not call the police or tell maternal great grandmother about his concerns.

Father admitted using and selling methamphetamine in the past. He said that he had a criminal record for possession and distribution of narcotics and had been incarcerated for drug charges. From April 2012 to January 2013, father was incarcerated for a driving under the influence conviction. He last used methamphetamine in April 2012, prior to his incarceration. Following his incarceration, father completed an alcohol rehabilitation program, two drug treatment programs, and a parenting program.

Father admitted that there had been domestic violence incidents between him and mother. He stated that the most recent incident occurred four months earlier when mother attacked him after he said that he was going to take A.Y. away from her. At the time, father was at mother's home to pick up A.Y. While father was holding A.Y., mother lunged at him and tried to take A.Y. out of his arms. Father was able to block mother with his arm. He suffered some scratches and bruises and reported the incident to the Pomona Police Department but no arrests were made because he did not press charges. Father denied ever hitting mother on the face, but admitted slapping her on the back of her head when they were driving together and mother grabbed the steering wheel, almost causing an accident. That incident took place before A.Y. was born. Father denied ever pushing or shoving mother. He also denied choking mother or grabbing her neck in a violent manner. He explained that when he was intimate with mother he had grabbed her neck.

The juvenile court found a prima facie case for detaining A.Y. and ordered him detained. It further ordered that father be tested for drugs and alcohol. The Department was ordered to provide mother with referrals for a parenting class, weekly drug testing, and a drug program. A.Y. was placed on a extended visit with paternal grandmother.

The Department's July 2, 2014, Jurisdiction/Disposition Report stated that father had an extensive criminal history that dated back to February 2006 and included several drug and alcohol related charges. Mother stated that father had a history of drug use, that

he had completed two programs, and that she was not sure if he was currently using drugs but did not think so.

Father stated that mother had a history of drug use and admitted using methamphetamine with her. He disclaimed any knowledge that mother currently was using drugs, but admitted that there were times that he suspect she was using drugs. On those occasions, father went to mother's home three to four times a day to check on her to make sure that she was not using drugs.

Father admitted that he had a history of drug use, but denied current use. He stated that he had not used drugs after being released from jail nine months earlier, he had completed two programs, and he had a sponsor. He admitted that he had a drink on his birthday on April 29, 2014. As for domestic violence, father admitted that he and mother had had some altercations that took place before A.Y.'s birth and that he had hit mother on the head while they were driving together and she grabbed the steering wheel. Father stated that he did not cause injury to mother and the police were not called. After A.Y. was born, he and mother had had "some arguments," but not in A.Y.'s presence. The social worker opined that father and mother were downplaying current domestic violence in their relationship.

According to the report, maternal great grandmother said that mother had a history of drug use that had become worse. Mother used "speed" when she was younger, but maternal great grandmother did not know what drugs mother was taking currently. Maternal great grandmother said that father had a history of drug use and continued to use drugs. She said that father used "speed" and methamphetamine and that he "sells speed." Mother told maternal great grandmother that father would not initially drug test for the Department because he would have tested positive. According to maternal great grandmother, father was physically and verbally abusive to mother who was afraid to say anything. She said that father hit and berated mother in A.Y.'s presence.

Maternal great grandmother reported to a social worker that father was having unmonitored contact with A.Y. in violation of a court order. The social worker spoke with paternal grandmother who said that father was sleeping in her home nightly, even

6

though she had been told prior to A.Y.'s placement that father could not stay in the home where A.Y. was placed.

At the start of the adjudication hearing, the juvenile court admitted the Department's June 11, 2014, Detention Report; June 18, 2014, Pre-Release Investigation Report; and July 2, 2014, Jurisdiction/Disposition Report. It also admitted father's October 3, 2012, Anger Management and Parenting Certificate; November 15, 2012, Substance Abuse Education and Personal Relationships Certificate; August 5, 2013, Proof of Enrollment and Completion of an alcohol program; and a letter confirming father's enrollment in a parenting class.

Father testified that he and mother had been in a relationship on and off for five years. They had not been in a relationship for the past six months. When they were in a relationship together and using drugs, they fought and argued often. Since father became clean and sober, there had not been much fighting. On one occasion, about six months earlier, there had been an incident between mother and father. When father went to mother's house to pick up A.Y., "grandmother" encouraged mother to not let him take A.Y. and mother attacked him while he held A.Y. Father suffered scratches and bruises on his arm and a police report "was made about it." Father also testified about the incident in the car three and a half years prior when he struck mother on the head after she grabbed the steering wheel.

Father testified that his present relationship with mother was "fine" and that there was no anger between them. Father wanted mother to get help and "wished nothing bad upon her." He explained that he learned how to better handle anger through his anger management classes and his father. He last felt very angry and hit someone four months earlier when a friend attacked him and he had to defend himself.

Father admitted that he had a drug and alcohol problem and that he had been convicted of and incarcerated for driving under the influence. As part of his sentence, the trial court ordered him to complete a driving under the influence program and to participate in Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings. Father completed the six-month program, but still went to AA and NA meetings and had

7

an active sponsor with whom he spoke every other day. Father last took methamphetamine over two years earlier, but admitted that he "slipped up" and drank alcohol on his birthday on April 29, 2014. He testified that he had taken three drug tests for the Department since the last court date, but did not have the results. He denied that he ever refused to test for the Department. Father also had signed up for an eight-week parenting course.

Mother pleaded no contest. The juvenile court sustained the section 300 petition as amended and declared A.Y. to be a dependent of the court. As to disposition, the juvenile court stated that the major issue it faced was whether A.Y. would remain placed with the paternal grandparents because it was not going to place A.Y. with father until "I get you to do some more work. I see a longer period. I also think you and mother need to find some kind of way to get over the issues that you have with each other." It placed A.Y. with paternal grandfather and his fiancée. It granted father daily monitored visits with A.Y., but ordered that father was not to spend the night at the paternal grandparents' residence. The juvenile court found that father "really was aware that mother was using."

Father was ordered to take 12 random, on-demand drug and alcohol tests. If any of the tests was positive, he would have to complete a "full drug program." Father also was ordered to take a parenting class that addressed domestic violence.

## DISCUSSION

### I. The Juvenile Court's Jurisdictional Findings as to Father

Father contends that substantial evidence does not support the juvenile court's jurisdictional findings as to him—i.e., the juvenile court's ruling that it had jurisdiction over A.Y. based on father's conduct. Although somewhat unclear, father further contends that we should exercise our discretion to consider this issue, notwithstanding mother's failure to challenge the jurisdictional findings as to her, because the juvenile court's jurisdictional findings as to him served as the basis for the juvenile court's dispositional order removing A.Y. from his custody. Sufficient evidence supports the

8

juvenile court's ruling that it had jurisdiction over A.Y., which evidence included certain jurisdictional findings as to father.

### A.    *Standard of Review*

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) "The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. [Citation.]" (*Ibid.*) We resolve conflicts in the evidence and draw reasonable inferences from the evidence in favor of the prevailing party. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.) Questions of fact and credibility are for the juvenile court. (*Ibid.*)

### B.    *Application of Relevant Principles*

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the [trial] court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762.) We may, however, exercise our discretion to consider a challenge to a jurisdictional finding that served as the basis for a dispositional order that is challenged on appeal. (*Ibid.*) Because father contends that the juvenile court's jurisdictional findings as to him served as the basis for its dispositional order removing A.Y. from his custody, we will exercise our discretion to consider this issue.

Section 300, subdivision (b)(1) provides that a child comes within the jurisdiction of the juvenile court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of

9

his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."  "The three elements for a section 300, subdivision (b) finding are:  '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.'  [Citation.]"  (*In re Savanah M., supra,* 131 Cal.App.4th at pp. 1395-1396.)  The initial exercise of dependency jurisdiction need not be supported by a current risk of harm.  (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261 ["current risk of harm is not required to support the initial exercise of dependency jurisdiction under section 300, subdivision (b), which is satisfied by a showing the child *has suffered* or there is a substantial risk that the child will suffer, serious physical harm or abuse"]; *In re J.K., supra,* 174 Cal.App.4th at p. 1435, fn. 5 ["at least with respect to section 300, subdivision (b), prior abuse and harm may be sufficient to support the *initial* exercise of jurisdiction"].)

Substantial evidence supports the first count against father.  The first count alleged that in 2014 mother had been under the influence of illicit drugs while caring for and supervising A.Y. and father knew of such illicit drug use and failed to protect A.Y. Maternal great grandmother stated that she believed that father started mother on drugs. Father admitted that he had used methamphetamine with mother.  When a social worker told father that mother tested positive for amphetamines, father said that he suspected mother was using methamphetamine again based on her behavior.  Father said that mother "would have a confused look on her face as if she was lost," and "[s]he just hasn't been herself."  Based on father's experience with mother when she was under the influence of methamphetamine, the juvenile court properly could infer that father was able to detect mother's use of methamphetamine even if he was not present when she

ingested the drug. Yet notwithstanding such detection, father admitted that he did not call the police or tell maternal great grandmother about his concerns. That is, father failed to take steps to protect A.Y. from mother's illicit drug use.

Father claims that the evidence shows only that he "suspected" but did not "know" that mother was using illicit drugs. Father's semantic argument is unavailing. Under facts of this case, father's failure to act even on his suspicion that mother was using illicit drugs, given mother's known history of drug use, constituted the failure to protect A.Y. from mother's illicit drug use.

Father also claims that there was no evidence that A.Y. was harmed by his failure to act or there was a substantial risk that A.Y. would suffer physical harm in the future. Mother was taken to the hospital apparently "heavily under the influence" of amphetamines. Mother's drug use and father's failure to take action to protect A.Y. from mother's illicit drug use posed a substantial, immediate risk of physical harm to A.Y.

Substantial evidence also supports the third count. The third count alleged that mother and father had a history of engaging in mutual physical altercations in the child's presence. Father contends that there was one reported incident where he struck mother— the incident where he hit her on the head when she grabbed the steering wheel—and that that incident took place before A.Y. was born. Father states that he and mother deny ongoing domestic violence. When mother "attacked" him recently, father contends, he "took the right course and did not engage and contacted the police."

Father stated that he and mother had been in a relationship on and off for five years. He admitted that during that relationship when they used drugs, they fought and argued often. Father admitted striking mother on the head on one occasion. Although mother said that father hit her only once, she also said that there had been other domestic violence incidents with father. Mother told a social worker that father had pushed her, "but not hard," and in effect said that father had choked her when she responded to a question about whether father had ever choked her by saying, "Not really, it wasn't like I passed out." Maternal great grandmother said that father "is abusive, physically and

11

verbally to [mother] and she is too afraid to say anything. He has berated her and hit her in the presence of [A.Y.] and controls [mother]."

Maternal great grandmother's statement concerning father's physical abuse of mother in front of A.Y. was sufficient evidence to support this count. Moreover, while father and mother attempted to minimize father's physical abuse and cast it as long in the past, such evidence also is sufficient to support a finding that father's prior conduct places A.Y. at risk currently from domestic violence. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133 ["Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.]"].)

Whether substantial evidence supports the second count—father had a history of methamphetamine and alcohol use and a 2012 conviction for driving under the influence of alcohol that rendered him incapable of providing regular care for A.Y.—is a closer question. We need not decide that question, however, because we found that substantial evidence supports the first and third counts against father and thus jurisdiction over A.Y. As we set forth above, "a reviewing court can affirm the [trial] court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re Drake M., supra,* 211 Cal.App.4th at p. 762.)

II. **The Juvenile Court's Dispositional Order Removing A.Y. from Father's Custody**

Father contends that the juvenile court's erroneous jurisdictional findings as to him caused it to treat him as an offending parent and thus to fail to apply section 361,

12

subdivision (c)(1)(B)[3] in making its dispositional order concerning A.Y.'s custody. Under section 361, subdivision (c)(1)(B), father argues, the juvenile court was "mandated" to allow him to retain physical custody of A.Y. as a non-offending parent as long as he presented a plan for protecting A.Y. from future harm that the juvenile court found acceptable. Because, as set forth above, the juvenile court properly found that father was an offending parent, it did not err in failing to apply section 361, subdivision (c)(1)(B).

Father further contends that the juvenile court erred by failing to make a finding of detriment in support of its order removing A.Y. from father's custody as required under section 361.2.[4] The juvenile court stated that it was not going to place A.Y. with father because it wanted father "to do some more work. I see a longer period." That is, father needed to address for a longer period his drug and alcohol issues. The juvenile court ordered father to take 12 random, on demand drug and alcohol tests. If any test was positive, father would have to participate in a drug rehabilitation program. The juvenile court also stated, however, that it was not going to place A.Y. with father because it believed that father and mother "need[ed] to find some kind of way to get over the issues that you have with each other." That is, father needed to address the domestic violence issue he had with mother. Consistent with that concern, the juvenile court ordered father

---

[3] Section 361, subdivision (c)(1)(B) provides, in pertinent part, "The court shall also consider, as a reasonable means to protect the minor, . . . [¶] Allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm."

[4] Section 361.2, subdivision (a) provides, in pertinent part: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."
Section 361.2, subdivision (c) provides: "The court shall make a finding either in writing or on the record of the basis for its determination under subdivisions (a) and (b)."

13

to take a parenting class that addressed domestic violence. Because the detriment to A.Y. from placement with father is clear from the record—shortly before the Department filed the section 300 petition, mother attacked father while he was holding A.Y. after father, by his own admission, told mother that he was going to take A.Y. away from her—we infer the finding of detriment required under section 361.2, subdivisions (a) and (c). (See *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1824-1827 [an appellate court may infer a finding of detriment under section 361.2, subdivisions (a) and (c) when the detriment is clear from the record].)

Father challenges the dispositional orders only to the extent that because he contends that there was not substantial evidence to support the jurisdictional findings as to him, he was a non-offending parent from whom custody of A.Y. should not have been taken. Father does not specifically attack the order that he take 12 random, on demand drug and alcohol tests. Instead, as stated, father only challenges the dispositional custody order. That dispositional custody order was supported by the juvenile court's jurisdictional findings that father failed to protect A.Y. from mother's drug abuse and father and mother had a history of physical altercations in A.Y.'s presence that endangered A.Y. and placed him at risk of harm, which jurisdictional findings we have affirmed. Moreover, father conceded at oral argument that the juvenile court properly could consider his history of substance abuse in fashioning a dispositional order if substantial evidence supports jurisdiction on any ground even if the evidence of his substance abuse history is insufficient to support jurisdiction. As stated, there is substantial evidence that father failed to protect A.Y. from mother's substance abuse and that he and mother had history of engaging in physical altercations in A.Y.'s presence.

## III.    Reasonable Alternatives to Removal

Father contends that the Department failed to provide evidence in support of its claim that it made reasonable efforts to avoid A.Y.'s removal. Father's contention is unavailing. Father cites no authority for the proposition that the Department was required to present evidence that it made reasonable efforts to avoid removal and did not object in

14

the juvenile court that the Department had failed to make any such required evidentiary showing.  Moreover, there is evidence that the Department made reasonable efforts to avoid A.Y.'s removal.  In its Jurisdiction/Disposition Report, the Department stated that it provided father with referrals for low/no cost drug rehabilitation services, random drug testing, and referrals for parenting courses.

## DISPOSITION

The juvenile court's ruling that it had jurisdiction over A.Y., certain of its jurisdictional findings as to father, and its dispositional order are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

KRIEGLER, J.

15